IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUXEYARD, INC., | Case No. 14-12170 (LSS) |
| Alleged Debtor. | Involuntary Petition |

### OPINION[1]

This case began on September 19, 2014 when Jinsun, LLC, Equity Highrise, Inc., Sun Bear, LLC, and Lee Bear I, LLC (the "Original Petitioners") filed an involuntary chapter 7 petition ("Petition") against Luxeyard, Inc. ("Luxeyard").[2]  On November 16, 2015, Chris Clayton and the Jonathan Camarillo Trust (together, the "Joining Petitioners") filed joinders[3] to the Petition pursuant to Bankruptcy Code section 303(c).[4]

Currently before the Court is Luxeyard's motion (the "Bar to Joinder Motion")[5] seeking to bar the joinders pursuant to the judicially created "bar to joinder" doctrine.  The Joining Petitioners, along with the one remaining Original Petitioner, Jinsun, LLC, object, arguing that the bar to joinder doctrine is bad law or, alternatively, that Luxeyard failed to

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent that this Court's authority is determined to be within the parameters of 28 U.S.C. § 157(c)(1), this Opinion and the accompanying Order shall be deemed to be the Court's proposed findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9033.

[2] *Involuntary Petition* at 3 [Dkt. No. 1]

[3] *Chris Clayton's Joinder in Involuntary Chapter 7 Bankruptcy Petition* [Dkt. No. 105]; *Jonathan Camarillo Trust Joinder in Involuntary Chapter 7 Bankruptcy Petition* [Dkt. No. 106]

[4] 11 U.S.C. § 303(c)

[5] *Alleged Debtor Luxeyard, Inc.'s Motion Barring the Joinder of the Jonathan Camarillo Trust and Chris Clayton as Petitioning Creditors in the Involuntary Petition Pursuant to 11 U.S.C. § 105* ("Bar to Joinder Motion") [Dkt. No. 117]

satisfy its evidentiary burden under the doctrine.[6]  On April 8, 2016, the Court held an

evidentiary hearing on the motion.[7]  Because Luxeyard has not met its burden to show that

the Petition was filed in bad faith, the Court will deny the Bar to Joinder Motion.

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a)

and (b)(1).  A motion to dismiss an involuntary petition is a core proceeding pursuant to 28

U.S.C. §§ 157(b)(2)(A) and (O).

**Procedural Posture**

This case has lingered.  The Petition was filed on September 19, 2014.  Luxeyard's

initial deadline for responding to the Petition was October 15, 2014, which was extended,

by stipulation, to November 4, 2014.[8]  On November 4, rather than answering the Petition,

Luxeyard filed a motion to transfer the venue of this case to the United States Bankruptcy

Court for the Central District of California, in the involuntary Chapter 7 case of LY Retail,

Inc. (a subsidiary of Luxeyard).[9]  While at the time, the LY Retail, Inc. case had been

dismissed, it was not yet closed by the Clerk of the Court.

On November 5, 2014, the Original Petitioners filed a certificate of counsel in which

they requested that the Court enter an order for relief because Luxeyard had, at that point,

failed to respond to the Petition in this Court.[10]  While the certificate of counsel mentioned

---

[6] *Objection of the Petitioning Creditors to Alleged Debtor Luxeyard, Inc.'s Motion Seeking to Bar Joinder of Additional Petitioning Creditors* [Dkt. No. 124] ("Objection")
[7] Transcript of Bar to Joinder Hr'g, Apr. 8, 2016 [Dkt. No. 155]
[8] *Stipulation Extending Time to Respond to Involuntary Petition* [Dkt. No. 7]
[9] *Notice of Filing of Motion to Change Venue with the United States Bankruptcy Court for the Central District of California Pursuant to Fed. R. Bankr. P. 1014* [Dkt. No. 8].  Luxeyard filed the *Notice of Venue Motion* shortly after midnight on November 5.  Luxeyard alleges that the filing process commenced before midnight and that the delay was due to technical problems.  *Luxeyard Inc.'s Motion for Reconsideration of the Order for Relief* ¶4 n.2 [Dkt. No. 18]
[10] *Certification of Counsel Requesting Entry of Order for Relief* [Dkt. No. 9]

2

the motion to change venue, it did not indicate that Luxeyard asserted in the motion that the Petition was filed in bad faith or that Luxeyard intended to defend against the Petition. The following day, the Court entered an order for relief.[11] Luxeyard then asked the Court to reconsider the order.[12] On January 21, 2015, following a series of filings and hearings on December 23, 2014 and January 16, 2015,[13] the Court granted the reconsideration motion and vacated the order for relief.[14] In the meantime, on December 17, 2014, the California Bankruptcy Court denied the motion to change venue, leaving the case in Delaware.[15]

On February 17, 2015, five months after the Petition was filed, Luxeyard filed a motion to dismiss (the "Motion to Dismiss")[16] the Petition raising three defenses: (i) the Original Petitioners are not, in fact, creditors because the convertible debentures on which their claims rest have been converted to equity; (ii) even assuming the Original Petitioners are creditors, their claims are subject to a *bona fide* dispute; and (iii) the Petition was filed in bad faith. After responsive and reply filings were made, the Court scheduled a hearing on the Motion to Dismiss for June 22, 2015, which was later adjourned to July 13, 2015.[17]

---

[11] *Order for Relief* [Dkt. No. 10]

[12] *Motion to Reconsider Order for Relief* [Dkt. No. 18]

[13] On December 31, 2014, the Honorable Peter J. Walsh retired and on January 7, 2015, this case was re-assigned to the undersigned who heard argument on January 16, 2015.

[14] *Order: (A) Granting Luxeyard Inc.'s Motion for Reconsideration of the Order for Relief; (B) Denying the Petitioning Creditors' Motion for Entry of Order Confirming (I) That Any Stay Pursuant to Fed. R. Bankr. P. 1014(b) Does Not Apply, (II) That This Court Has Jurisdiction over the Involuntary Petition, the Order for Relief, and Any Motion to Transfer Venue, and (III) Requiring the Debtor to File the List Required by Fed. R. Bankr. P. 1007(a)(2); And (C) Vacating the Notice Appointing the Trustee* [Dkt. No. 58]

[15] Ex. L, Docket Report at 31, *LY Retail LLC*, 13-17237 (Bankr. C.D. Cal.) ("LY Retail Bankruptcy Docket Report")

[16] *Alleged Debtor Luxeyard, Inc.'s Motion to Dismiss the Involuntary Petition* ("Motion to Dismiss") [Dkt. No. 64]; *Notice of Filing of Exhibits and Declarations to the Alleged Debtor Luxeyard Inc.'s Motion to Dismiss the Involuntary Petition* [Dkt. No. 65]

[17] *Notice of Adjourned Hearing* [Dkt. No. 82]

At the hearing, Luxeyard was unprepared to develop an evidentiary record and presented no witnesses.[18]  But, Luxeyard asserted that factual issues remained.  Upon questioning, Luxeyard's counsel stated that there may be relevant documents not before the Court.[19]  Further, Luxeyard was unprepared to address the securities law issues surrounding its assertion that the convertible debentures had converted to equity.[20]  At the conclusion of the hearing, the Court indicated that given the record, or lack thereof, and the relevant legal issues, a further evidentiary hearing might be necessary.[21]  After an in-chambers review, the Court informed the parties that it was.

On August 24, 2015, the Court convened a status conference to address the scheduling of a further hearing on the Motion to Dismiss.  At the conclusion of the status conference, the Court directed the parties to: (i) proceed with discovery in preparation for an evidentiary hearing on the Motion to Dismiss, (ii) present to Chambers an agreed upon scheduling order with the trial date open for Chambers to schedule; and, if they desired, (iii) provide an agreed record (*i.e.*, documents) for consideration of the securities law issue as a matter of law.  No scheduling order has been presented to the Court, nor have the parties supplied an agreed record on the securities law issue.

At a further status conference held on November 2, 2015, the Court was advised that three of the four Original Petitioners—Equity Highrise, Inc., Sun Bear, LLC, and Lee Bear I, LLC—were in the process of settling claims against them in the Alattar Action (defined below) and, as part of that settlement, they would withdraw from the Petition and consent to the dismissal of the involuntary case.  Only Jinsun, LLC would remain as a petitioning

---

[18] Transcript of Mot. to Dismiss Hr'g, July 13, 2015 [Dkt. No. 91]
[19] Mot. to Dismiss Hr'g Tr. 11
[20] *Id.* at 57–59
[21] *Id.* at 69–70

creditor. After two more status conferences, on November 20, 2015, the Court entered

orders approving the withdrawals from the Petition as to all Original Petitioners other than

Jinsun.[22] In the meantime, on November 16, 2015, the Joining Petitioners filed their

joinders.

On January 19, 2016, the Court held yet another status conference to determine the

course of the case.[23] At this status conference, counsel for Luxeyard stated that,

independent of the Motion to Dismiss, it intended to file a motion to bar the joinder of the

Joining Petitioners.[24] The Court directed Luxeyard to file the bar to joinder motion by

January 29, 2016 and, upon doing so, to contact Chambers to schedule the hearing for a

date in the near future.[25]

On February 1, 2016, Luxeyard filed the instant Bar to Joinder Motion. On

February 25, 2016, counsel for the petitioners sent a letter to the Court requesting its

assistance in advancing the case.[26] Counsel noted that while the motion was filed, no

hearing had been scheduled. In March, the Court addressed discovery disputes at the

request of petitioners' counsel.[27]

On April 8, 2016—over a year and a half from the date the Petition was originally

filed—the Court held an evidentiary hearing on the Bar to Joinder Motion (the "Joinder

---

[22] *Order (with Revision by the Court) Approving Stipulation between Equity Highrise, Inc. and Luxeyard Inc. Regarding Discontinuance and Withdrawal of Involuntary Petition* [Dkt. No. 109]; *Order (with Revision by the Court) Approving Stipulation between Lee Bear I, LLC and Luxeyard Inc. Regarding Discontinuance and Withdrawal of Involuntary Petition* [Dkt. No. 110]; *Order (with Revision by the Court) Approving Stipulation between Sun Bear, LLC and Luxeyard Inc. Regarding Discontinuance and Withdrawal of Involuntary Petition* [Dkt. No. 111]
[23] *Notice of Status Conference* [Dkt. No. 114]
[24] Status Conference Hr'g Tr. 7, Jan. 19, 2015 [Dkt. No. 129]
[25] *Id.* at 9
[26] Feb. 25, 2016 Letter to the Court, Dennis A. Melro, Esq. [Dkt. No. 131]
[27] Mar. 22, 2016 Letter to the Court, Dennis A Melro, Esq. [Dkt. No. 134]

Hearing"). The parties offered numerous documents into evidence and proffered the live testimony of Messrs. Mireskandari and Casey.[28]  This motion is ripe for consideration.

**Factual Findings**

*The Alleged Debtor*

Luxeyard, the alleged debtor, is a publicly traded holding company, which owns LY Retail, LLC ("LY Retail") an entity that at one time conducted online sales of luxury consumer products.[29]  Luxeyard was co-founded by Amir Mireskandari, its interim CEO, and Kahled Alattar.[30]

Kevin Casey is the sole manager and only employee of Jinsun, LLC,[31] which is now the lone Original Petitioner remaining in this case.  Jinsun was formed in 2010 and its only business relates to investments.[32]  Jinsun has one member, Silver Star Holdings Trust (the "Trust").[33]  Mr. Casey is both the trustee and the beneficiary of the Trust.[34]  The Trust also is the sole member of another entity, Far East Strategies, Inc.; Mr. Casey is also the manager of this entity.[35]  In 2011, Far East Strategies was in the consulting and investment business.[36]

In mid-July 2011, Amir Mireskandari met with Kevan Casey (purportedly with his Far East Strategies hat on) to discuss the idea of raising money for LY Retail by issuing

---

[28] While most exhibits were admitted without objection, hearsay and relevance objections were lodged to Exhibits 20, 21, and H.  The Court has now considered the objections and sustains each of them.  The parties agreed to admit Exhibits 35 and 36 for the sole purpose of reflecting the dates on which two opinions were filed in separate cases.
[29] Ex. 12, *Form 10-Q for Luxeyard, Inc. for the quarter ended September 30, 2012* at 10
[30] Ex. 5, *Plaintiffs' Second Amended Omnibus Petition* ¶ 42
[31] Ex. 32, Casey Dep. 12, Oct. 30, 2014
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* at 13–14
[36] *Id.* at 14–15

Luxeyard stock.[37]  At some point thereafter, Far East Strategies agreed to introduce

investors to Luxeyard.[38]  At the time of this discussion, Luxeyard was a privately held

company.  To effectuate a stock issuance, in early 2012, Luxeyard completed a reverse

merger with a publicly traded company[39] and began issuing stock to investors.  Luxeyard

also issued convertible debentures in 2012 (the "2012 Convertible Debentures").

Notwithstanding the issuance of stock and the 2012 Convertible Debentures, LY Retail was

forced to cease operations.[40]  Luxeyard unsuccessfully attempted to "re-launch" LY Retail

in 2014.[41]

Luxeyard, Mr. Mireskandari, and Mr. Alattar, have alleged in multiple legal actions

that Mr. Casey orchestrated Luxeyard's reverse merger and subsequent stock issuances as

part of a fraudulent pump-and-dump scheme.  Specifically, in August 2012, Luxeyard, LY

Retail, and Amir Mireskandari (or some combination of them) filed a suit in Texas state

court seeking damages resulting from the alleged pump-and-dump scheme (the "Pump and

Dump Action").[42]  They assert that a group of knowing participants, led by Mr. Casey and

including the Original Petitioners, obtained Luxeyard stock for little or no value,

fraudulently inflated the stock's value, and sold the stock off at a profit for themselves.  They

assert that these actions caused a crash in Luxeyard's stock price, which damaged Luxeyard

and all remaining stockholders.[43]  The defendants included Mr. Casey, the Original

Petitioners, and the Jonathan Camarillo Trust (which is every petitioning creditor other

---

[37] Bar to Joinder Hr'g Tr. 25; Ex. 32, Casey Dep. 35, Oct. 30, 2014
[38] Ex. 32, Casey Dep.18, 35–36, 149–150
[39] *Id.* at 42–48
[40] Bar to Joinder Hr'g Tr. 36, 148–49, 196
[41] *Id.* at 42–43
[42] Ex I, Mireskandari Decl. ¶ 41, Mar. 1, 2013; Ex J, Mireskandari Decl. ¶¶ 3–4, Apr. 3, 2013
[43] Bar to Joinder Hr'g Tr. 26–27, 69

than Chris Clayton). Mr. Casey, and presumably all other remaining defendants, deny these allegations.[44]

One month later, on September 21, 2012, Luxeyard, LY Retail, and Mr. Mireskandari executed a settlement (the "2012 Luxeyard Settlement), by which they settled the claims surrounding the pump and dump scheme with numerous defendants, including, as relevant here, Mr. Casey, Jinsun, LLC, the Jonathan Camarillo Trust, and the other Original Petitioners. The Luxeyard Settlement called for a payment to Luxeyard of $1,500,000, which was deposited into an LY Retail bank account as Luxeyard had no bank account at that time.[45] Of course, none of the settling defendants admitted liability in connection with the underlying action, and Mr. Casey testified that he settled in order to, among other things, avoid the cost of litigation. Further, the settlement agreement specifically provides that "[t]his Agreement does not alter or effect [sic] any of the rights, liabilities or obligations of [Luxeyard] to the Defendants, if any, pursuant to" among other things, the "2012 Convertible Debentures."[46]

Subsequently, $200,000 of the settlement funds were transferred from Luxeyard to Mr. Mireskandari who asserted it was in partial repayment of a $650,000 loan from him to Luxeyard.[47] No other creditors received payment from Luxeyard out of the settlement funds.[48]

---

[44] Bar to Joinder Hr'g Tr. 155
[45] Bar to Joinder Hr'g Tr. 113; Ex. I, Mireskandari Decl. ¶ 32-33, Mar. 1, 2013
[46] Ex. B, *Confidential Settlement Agreement and Mutual Release dated Sept. 21, 2012*, ¶ 25. The Court is not making any determinations regarding the provisions in the Settlement Agreement at dispute in the Motion to Dismiss.
[47] Bar to Joinder Hr'g Tr. 113
[48] *Id.*

Mr. Alattar was not a party to the 2012 Luxeyard Settlement.  Three days prior to the execution of the 2012 Luxeyard Settlement, on September 18, 2012, Mr. Alattar filed a shareholder derivative suit in Texas state court (the "Alattar Action"), which largely mirrors the pump-and-dump related claims made in the Pump and Dump Action.[49]  In Mr. Alattar's initial complaint, he sued "everybody," including Luxeyard.[50]  But, as Mr. Mireskandari explained, Luxeyard and Mr. Alattar subsequently "joined forces,"[51] and Luxeyard has realigned itself as a plaintiff in the Alattar Action.[52]

In his current complaint, Mr. Alattar asserts claims against 36 defendants including each of the Original Petitioners and the Jonathan Camarillo Trust.[53]  Mr. Alattar has settled his claims against various defendants in the Alattar Action, including some of those with whom Luxeyard settled in the 2012 Luxeyard Settlement.  While Luxeyard, as plaintiff, has asserted claims against numerous of the 36 defendants, because of the Luxeyard Settlement, it has not asserted claims against the Original Petitioners or the Joining Petitioners.[54]  Luxeyard funds "most" of the Alattar litigation,[55] which Mr. Mireskandari characterizes as "very extremely expensive."[56]

---

[49] Bar to Joinder Hr'g Tr. 46–48, 133; *Plaintiff's Original Petition, Alattar v. Casey, et al.*, No. 12-54501 (113th Dist. Ct. Tex., Sept. 18, 2012).  The Court understands that whether the Pump and Dump Action and the Alittar Action assert the same claims may be an issue of contention in the Alattar Action.  The Court's shorthand here for purposes of background is not intended to, and should not be construed to, constitute any binding finding of fact or conclusion of law relative the Alattar Action or other litigation between the parties.

[50] Bar to Joinder Hr'g Tr. 48, 133

[51] *Id.* at 48

[52] Ex. 5, *Plaintiffs' Second Amended Omnibus Petition*

[53] *Id.* ¶¶ 4–38

[54] *Id.*

[55] Bar to Joinder Hr'g Tr. 101

[56] *Id.* at 38

According to Mr. Mireskandari, Luxeyard's biggest asset is recoveries from the Alattar Action.[57] Mr. Mireskandari testified that there is a "sharing agreement" whereby funds received pursuant to a settlement agreement in the Alattar Action are allocated among various entities and individuals.[58] There is no written agreement memorializing this arrangement;[59] rather, it is *ad hoc*. The settling parties determine, on a case-by-case basis, what the distribution will be.[60] And, the allocation can be different every time.[61]

That such an arrangement exists is reflected in three settlement agreements that were submitted into evidence by Luxeyard. The Gann and Friedlander settlement agreement (made as of November 9, 2015) allocates a $275,000 settlement payment to the following persons in the following amounts (a) Alattar $91,666.67, (b) LY Retail Texas $91,666.67 and, (c) Luxeyard $91,666.67.[62] The Acadia settlement agreement (made as of December 29, 2015) allocates a $1,750,000 settlement payment to the following persons in the following amounts: (a) Alattar $250,000, (b) Luxeyard $600,000, (c) LY Retail $600,000, (d) Ran Mires $100,000, and (e) Mr. Mireskandari $200,000.[63] Finally, the Huttner settlement agreement (made as of April, 2015) allocates a $211,550 settlement payment to the following persons in the following amounts: (a) Alattar $150,000, (b) Daghighi $4,500, (c) Ran Mires, $4,500, (d) LY Retail Texas $3,500, (e) LY Retail California $3,500, (f) Luxeyard $40,000, (g) Alidad Mireskandari $500, and (h) Mireskandari $5,000.[64]

---

[57] *Id.* at 36
[58] *Id.* at 48, 99–101
[59] *Id.* at 99
[60] *Id.* at 99–101
[61] *Id.*
[62] Ex. 6, *Confidential Settlement and Indemnity Agreement*
[63] Ex. 7, *Confidential Settlement and Indemnity Agreement*
[64] Ex. 8, *Confidential Settlement and Indemnity Agreement*

Notwithstanding the different allocations in each settlement agreement, the Alattar/Luxeyard parties to the agreement are the same (*i.e.*, Khaled Alattar, Babak Daghighi, Luxeyard, Inc., LY Retail, LLC (a Texas limited liability company), LY Retail, LLC (a California limited liability company), Amir Mireskandari, Ran, Mires, Clark & Associates, LLC (a Texas limited liability company), and certain lawyers).[65] Ran, Mires, Clark & Associates LLC is a firm run by Mr. Mireskandari.[66] Alidad Mireskandari is Mr. Mireskandari's brother, and Mr. Daghighi is Mr. Mireskandari's brother-in-law.[67] From these settlements, Luxeyard received $131,666.67 from persons it settled with in the 2012 Luxeyard Settlement, namely, Mr. Gann, Mr. Friedlander, and Mr. Huttner. No evidence was presented regarding the account in which Luxeyard's $731,666.67 share of the above settlements was deposited or how the funds were used.

### The Current Petitioning Creditors

Each of the petitioning creditors asserts a claim based on a 2012 Convertible Debenture. Assuming the 2012 Convertible Debentures were not converted to equity, they matured on January 31, 2014.[68]

Mr. Casey's investment was made through Jinsun.[69] Prior to filing the Petition, Mr. Casey reviewed Luxeyard's 10-Q for the quarters ending in June and September of 2012, which were the most current forms then on file with the Securities and Exchange Commission.[70] He testified that these filings contained a going concern qualification from

---

[65] Ex. 6, Ex. 7, Ex. 8
[66] Bar to Joinder Hr'g Tr. 100
[67] *Id.*
[68] Ex. 3, *Series C List*; Bar to Joinder Hr'g Tr. 147; Ex. C, *Luxeyard Form 10-Q issued for the quarter ended June 30, 2012* at 18
[69] Ex. 3, *Series C List*
[70] Bar to Joinder Hr'g Tr. 135; Ex. C, *Form 10-Q for Luxeyard, Inc. for the quarter ended June 30, 2012*; Ex. 12, *Form 10-Q for Luxeyard, Inc. for the quarter ended September 30, 2012*

Luxeyard's auditors and reflected balance sheet insolvency.[71] He was also aware that settlement monies were being paid to Luxeyard and that Luxeyard did not have a bank account.[72] Mr. Casey reviewed Luxeyard's auditor's papers; he testified that they show that no payments had been made to any debenture holders and the debentures had not been converted.[73] Further, Mr. Casey, through his attorneys, made a demand on Luxeyard, under section 220 of the Delaware General Corporation Law, for financial and other information.[74] Finally, he spoke with other creditors who confirmed they had not been paid on their debentures.[75]

Mr. Camarillo's investment is held in the Jonathan Camarillo Trust. He serves in the military and is currently stationed in Japan.[76] Mr. Camarillo and Mr. Casey have been best friends for over twenty-five years; they speak to each other on a daily basis.[77] Mr. Camarillo testified that Mr. Casey introduced him to multiple investments, including Luxeyard.

Chris Clayton was introduced to Luxeyard by Mr. Gann and made an investment of $100,000 in 2012.[78] Mr. Casey contacted him to join the Petition, which was the first

---

[71] Bar to Joinder Hr'g Tr. 135; Ex. C, *Form 10-Q for Luxeyard, Inc. for the quarter ended June 30, 2012* at 4
[72] *Id.*
[73] Bar to Joinder Hr'g Tr. 146–147. Luxeyard objected to this testimony as hearsay. The Court overruled the objection because the testimony was relevant to Mr. Casey's due diligence. But, because one of the arguments in the Motion to Dismiss is that the debentures have been converted to equity, the Court did not admit this testimony for the truth of the statements in the auditor's report, and expressly makes no finding on the issue.
[74] Bar to Joinder Hr'g Tr. 147–148; Ex. 38, *Hirsch & Westheimer Letter*
[75] Bar to Joinder Hr'g Tr. 148
[76] Ex. 9, Camarillo Dep. 9:3, October 9, 2015 taken in *Alattar v. Casey, In the District Court of Harris County, Texas, 113th Judicial District,* Cause No. 2012-54501 . As this deposition was taken in the Alattar Action, and as the Court is not making any decision on the allegations in that action, much of the deposition is not relevant to the matter *sub judice.*
[77] Ex. 9, Camarillo Dep. 12:11–13, 14:1–25
[78] Ex. 10, Clayton Dep. 22, 44–45, 94. Much of this deposition appears to be directed towards the alleged pump and dump scheme.

conversation he had ever had with Mr. Casey.  He then reviewed his debenture and other documents, and spoke with the lawyer representing the Original Petitioners.[79]  After giving it some thought, he decided to join the Petition to collect on his 2012 Convertible Debenture.  Prior to the call from Mr. Casey, Mr. Clayton had not made a demand on Luxeyard.

### Previous Bankruptcy Cases

On December 27, 2012, three entities that are not party to this case filed an involuntary petition against Luxeyard in the United States Bankruptcy Court for the Central District of California (the "First Luxeyard Bankruptcy").[80]  Those petitioners asserted claims based on goods delivered to LY Retail.[81]  In the first two months of 2013, two of the Original Petitioners, Jinsun and Lee Bear I, LLC, filed joinders.[82]  Lee Bear I, LLC filed its joinder with another entity, Lazy Bear, LLC—those two entities were treated as one creditor.[83]  Jinsun and the Lee Bear/Lazy Bear entity asserted claims based on Luxeyard's alleged breach of a contractual indemnity obligation.

Luxeyard filed a motion to dismiss the Petition.[84]  It argued, in part, that every petitioning creditor other than Jinsun and the Lee Bear/Lazy Bear entity had incorrectly asserted a claim against Luxeyard.[85]  According to Luxeyard, those petitioners actually held

---

[79] Ex. 10, Clayton Dep. 53–54

[80] Ex. K, Docket Report, *In re Luxeyard, Inc.*, No. 12-51986 (Bankr. C.D. Cal.) ("First Luxeyard Bankruptcy Docket Report")

[81] Ex. M, *Transcript of Proceedings in the First Luxeyard Bankruptcy*, Oct. 2, 2013 before the Honorable Barry Russell ("Russell Bench Ruling") at 18–22

[82] Bar to Joinder Hr'g Tr. 132–34; Ex. K, First Luxeyard Bankruptcy Docket Report, *Joinder of Jinsun, LLC to the Involuntary Petition Filed by Petitioning Creditors*, Jan. 23, 2013; Ex. K, First Luxeyard Bankruptcy Docket Report, *Joinder of Lee Bear I, LLC / Lazy Bear, LLC to the Involuntary Petition Filed by Petitioning Creditors*, Feb. 1, 2013

[83] Ex. M, Russell Bench Ruling at 17–18; Bar to Joinder Hr'g Tr. 134

[84] Ex. K, First Luxeyard Bankruptcy Docket Report at 4

[85] Ex. M, Russell Bench Ruling at 18-22; Bar to Joinder Hr'g Tr. 54

claims against LY Retail.  The petitioners argued that, although their contractual claims were against LY Retail, they nonetheless had claims against Luxeyard based on the theory that LY Retail was Luxeyard's alter ego.[86]  The court ultimately granted Luxeyard's motion to dismiss because it found that there existed a bona fide dispute as to the alter ego theory.[87]

Following the dismissal, Luxeyard filed a motion seeking damages from all the petitioners pursuant to Bankruptcy Code section 303(i).[88]  As part of that motion, Luxeyard alleged that the petitioners other than Jinsun and the Lee Bear/Lazy Bear entity filed the petition in bad faith because they had failed to perform adequate diligence regarding which entity was the contractual debtor and, upon learning of the mistake, failed to withdraw from the case.  Luxeyard separately alleged that Jinsun and the Lee Bear/Lazy Bear entity filed their joinders, in part, for the bad faith purpose of furthering the alleged pump-and-dump scheme.[89]  On April 10, 2013, the Honorable Barry W. Russell denied the motion in its entirety, declining to even award fees and costs.[90]

As part of his ruling, Judge Russell found that bad faith did not exist.[91]  In his bench ruling, Judge Russell appeared to focus on the allegations of bad faith made against the petitioners other than Jinsun and the Sun Bear/Lee Bear entity.[92]  The court found that much of the problem that the petitioners had in identifying the correct debtor entity were due to the debtor treating Luxeyard and LY Retail as one entity.[93]  Judge Russell did not

---

[86] *Id.* at 66–67, 84–85
[87] *Id.* at 34–35, 66–68
[88] Ex. K, First Luxeyard Bankruptcy Docket Report at 11
[89] Ex. M, Russell Bench Ruling at 24–25
[90] *Id.* at 84–88
[91] *Id.* at 84
[92] *Id.* at 84–86
[93] *Id.* at 86–88

state any explicit findings regarding Luxeyard's bad faith allegation against Jinsun and the Lee Bear/Lazy Bear entity.

Luxeyard appealed that ruling.  After the Ninth Circuit Bankruptcy Appellate Panel dismissed Luxeyard's appeal of the order denying sanctions, on October 21, 2014 (after this case began), Luxeyard asked Judge Russell to reconsider his decision.  After holding a hearing on the motion to reconsider, Judge Russell entered an order denying the motion on December 17, 2014.[94]

On March 20, 2013, entities that are not party to this case filed an involuntary petition against LY Retail in the United States Bankruptcy Court for the Central District of California (the "LY Retail Bankruptcy").[95]  In July 2014, LY Retail and the petitioning creditors in that case executed a settlement agreement that resulted in the dismissal of the case.[96]

**The Parties' Legal Arguments**

Luxeyard argues that, pursuant to the judicially created bar to joinder doctrine, the Court should deny the Joining Petitioners' request to join the Petition because it was originally filed in bad faith in order to achieve certain improper purposes.[97]  Jinsun and the Joining Petitioners argue that the doctrine, which has not yet been adopted by the Third Circuit,[98] is bad law, and is therefore inapplicable.[99]  They also argue that the Petition was not filed in bad faith.

---

[94] Ex. K, First Luxeyard Bankruptcy Docket Report at 26
[95] Ex. L, LY Retail Bankruptcy Docket Report at 2; Ex. 19, *Settlement Agreement*; Bar to Joinder Hr'g Tr. 134
[96] Ex. 19, *Settlement Agreement*
[97] Bar to Joinder Mot. ¶¶ 36–37
[98] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 338 (3d Cir. 2015)
[99] The petitioners cite to multiple cases that decline to apply the doctrine, finding that it "is inconsistent with the unambiguous plain language of section 303(c)." *In re FKF Madison Park Group*

**Discussion**

Section 303(b) of the Bankruptcy Code contains three prerequisites for commencing an involuntary case against a debtor that, like Luxeyard, has at least twelve creditors: (1) there must be three or more petitioning creditors; (2) each petitioning creditor must hold a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute; and (3) the claims must aggregate at least $15,775 more than the value of liens on the debtor's property.[100] If the alleged debtor challenges the petition, section 303(h) requires a court to also find that the debtor is generally not paying its debts as they becomes due, unless the unpaid debt is the subject of a bona fide dispute.[101] A court must dismiss a petition if it does not meet these prerequisites.[102]

A related provision, found in section 303(c), provides that before a court enters an order dismissing a case additional creditors may join the petition with the "same effect" as if such joining creditors had been a party to the original petition.[103] "This provision provides for joinder of creditors as a matter of right."[104]

The joinder permitted by section 303(c) creates a potentially troubling scenario where a petition as originally filed is deficient, but is later cured by the addition of a joining creditor. Some courts have expressed concern at this situation, noting that a creditor might attempt to "circumvent" the prerequisites of an involuntary bankruptcy by knowingly filing

---

*Owner, LLC*, 435 B.R. 906, 908 (Bankr. D. Del. 2010) (citations omitted); *see also In re Kidwell*, 158 B.R. 203, 207 (Bankr. E.D. Cal. 1993) (finding the bar to joinder doctrine "obsolete, counterproductive, and inconsistent with the 1978 Bankruptcy Code").

[100] 11 U.S.C. § 303(b)(1); *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 333 (3d Cir. 2015); *In re Diamondhead Casino Corp.*, 540 B.R. 499, 505–06 (Bankr. D. Del. 2015)

[101] 11 U.S.C. § 303(h)(1)

[102] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015)

[103] 11 U.S.C. § 303(c)

[104] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 337 (3d Cir. 2015) (citing *In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. 906, 907–08 (Bankr. D. Del. 2010))

a deficient, original petition and then later curing the deficiency with a joinder.[105]  Courts

have noted that the filing of a deficient petition is problematic because the prerequisites to

an involuntary case are not "meaningless formalities," but rather serve to protect an alleged

debtor from the negative effects of bankruptcy.[106]

In light of this concern, some courts have limited joinders using the judicially created

bar to joinder doctrine.  The doctrine provides that if a party files a petition in bad faith, a

court will prohibit other creditors from curing the petition by later joining under section

303(c).  The cases cited by the parties as well as the cases reviewed by the Court reveal that

courts have applied the doctrine to one type of bad faith filing: when a petitioner knows at

the time of filing that the petition does not satisfy the prerequisites of section 303.[107]

Application of the doctrine in such circumstances is consistent with the purpose of the

doctrine, which is to protect the integrity of the statutory prerequisites.

Luxeyard argues that the doctrine should also apply to a second type of bad faith

filing that was described in *Forever Green*.  In that case, the Third Circuit held that an

involuntary petition that meets the statutory prerequisites may nonetheless be dismissed if

the petition was filed in bad faith.[108]  As such, Luxeyard argues that, if the Court determines

that the Petition was originally filed in bad faith, it should bar the joinders and dismiss the

Petition.[109]  Moreover, Luxeyard argues that because Jinsun is the only Original Petitioner

that has not withdrawn from the Petition, the Court can bar the joinders if it finds that

---

[105] *Basin Elec. Power Co-op. v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir. 1985)
[106] *Id.*
[107] *Basin Elec. Power Co-op. v. Midwest Processing Co.*, 769 F.2d 483, 486–87 (8th Cir. 1985); *In re Mylotte, David & Fitzpatrick*, 2007 WL 2033812, at *9 (Bankr. E.D. Pa. July 12, 2007); *In re R & A Bus. Assocs., Inc.*, 1999 WL 820859, at *2 (E.D. Pa. Oct. 14, 1999); *In re Centennial Ins. Assocs., Inc.*, 119 B.R. 543, 546 (Bankr. W.D. Mich. 1990)
[108] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015)
[109] Bar to Joinder Mot. ¶¶ 25, 36.

Jinsun alone filed the Petition in bad faith, presumably, even if the other Original

Petitioners did not.[110] Thus, under Luxeyard's proffered bar to joinder rule, if the Court

finds that Jinsun filed the Petition in bad faith, the Court may bar the joinders.

***Standard***

"At its most fundamental level, the good faith requirement ensures that the

Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose

aims are antithetical to the basic purposes of bankruptcy."[111] After surveying standards used

by other courts, the Third Circuit adopted the "totality of the circumstances" standard when

reviewing an allegation that an involuntary petition was filed in bad faith. This standard is

an amalgam of tests used by other courts, which incorporates both objective and subjective

tests, including the "improper purpose" test, the "improper use" test, and the "Rule 11"

test.[112]

The "improper purpose" test asks whether an involuntary petition was "motivated by

ill will, malice or a desire to embarrass or harass the alleged debtor"[113] or for some other

purpose for which it is inappropriate to seek redress from *any* court. So, for example, it is

not a proper purpose to file an involuntary petition to frustrate proceedings in other courts

or to force a company out of business,[114] as it would be improper to file a complaint in a

state or federal court of general jurisdiction for those same purposes.

---

[110] Bar to Joinder Mot. ¶¶ 36–37
[111] *Forever Green*, 804 F.3d at 335 (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004))
[112] *Diamondhead Casino*, 2016 WL 3284674, at *16
[113] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015) (citing *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 105 (2d Cir. 2000))
[114] *In re Better Care, Ltd.*, 97 B.R. 405, 412 (Bankr. N.D. Ill. 1989); *see In re WLB-RSK Venture*, 296 B.R. 509 (Bankr. C.D. Cal. 2003) (improper to file a petition "to circumvent [the petitioner's] lack of success over the past eight years in prior litigation"); *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) ("Filing an involuntary petition with the intent to gain a strategic advantage [in pending

The "improper use" test assumes an appropriate purpose (*i.e.*, an appropriate basis for filing a complaint in a state or federal court of general jurisdiction), but then asks whether it was proper to use the bankruptcy process to achieve that purpose.[115] Certain purposes may be "entirely proper of themselves, such as customary debt collection or the resolution of intranecine [sic] corporate disputes."[116] Filing an involuntary bankruptcy petition to achieve those purposes is, however, an improper use of the bankruptcy system if the circumstances do not "justify the particular remedy of involuntary bankruptcy."[117] So, for example, a creditor may use the device of an involuntary petition when bankruptcy is necessary to assure equal distribution among creditors.[118] As such, it is proper to file an involuntary petition to "protect against other creditors obtaining a disproportionate share of the debtor's assets."[119]

Conversely, it is an improper use of the bankruptcy system to file an involuntary petition to obtain a disproportionate advantage for a petitioner's own position.[120] Examples of such disproportionate advantage include filing in order to trigger a contract provision that allowed one creditor to receive escrowed collateral,[121] in order to change corporate control,[122] or to cause a debtor to pay certain creditors first in order to reduce personal

---

litigation], rather than to protect one's interest relative to other creditors or to prevent dissipation of assets, constitutes an improper purpose."); *In re K.P. Enterprise*, 135 B.R. 174 (Bankr. D. Me. 1992) (a creditor filed for the improper purpose of delaying a foreclosure to induce a more "leisurely" sale, which the petitioner hoped would realize a greater return for his subordinated, secured position)

[115] *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989)

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.* (the *Better Care* court appears to have coined this heavily used iteration of the improper use test); *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335–36 (3d Cir. 2015)

[120] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 335–36 (3d Cir. 2015)

[121] *Basin Elec. Power Co-Op. v. Midwest Processing Co.*, 769 F.2d 483 (8th Cir. 1985)

[122] *In re Wavelength, Inc.*, 61 B.R. 614 (B.A.P. 9th Cir. 1986); *In re Better Care, Ltd.*, 97 B.R. 405 (Bankr. N.D. Ill. 1989)

liabilities on a petitioner's guarantee.[123] It is also improper to use bankruptcy as a substitute for customary debt collection against a solvent entity.[124] In such circumstances, bankruptcy is not necessary for recovery—a petitioner can advance its own interest in a non-bankruptcy forum.[125]

The "objective test" asks what a reasonable person would have believed and how they would have acted in the petitioner's situation.[126] The "objective test" is not so much an analytical standard as it is an evidentiary standard. Courts applying the objective test believe that bad faith should be determined only with objective evidence of the reasonableness and appropriateness of filing an involuntary petition.[127] Consequently, those courts hold that "the subjective motives held by any of the petitioning creditors are not to be weighed when determining whether bad faith has been established."[128]

Finally, under the "Rule 11" test, also called the "combined" or "two part" test, a court reviews both subjective motivations and the objective reasonableness of a petitioner's actions before filing an involuntary petition.[129] When applying this test, courts are often guided by the standard applied to sanctions motions under Bankruptcy Rule 9011.[130] The

---

[123] *In re Better Care, Ltd.*, 97 B.R. 405 (Bankr. N.D. Ill. 1989)
[124] *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100 (Bankr. S.D. Fld. 1981) (the *SBA* court appears to have coined the "substitute for customary collection procedures" phrase); *In re Nordbrock*, 52 B.R. 370, 372 (D. Neb. 1984) *aff'd*, 772 F.2d 397 (8th Cir. 1985) ("This case reflects efforts by a single creditor to use the Bankruptcy Court as a forum for the trial and collection of an isolated disputed claim, a practice condemned in prior decisions.")
[125] *In re K.P. Enterprise*, 135 B.R. 174, 179 n.14 (Bankr. D. Me. 1992); *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015)
[126] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015); *In re Grecian Heights Owners' Ass'n*, 27 B.R. 172, 173 (Bankr. D. Or. 1982)
[127] *In re Grecian Heights Owners' Ass'n*, 27 B.R. 172, 173 (Bankr. D. Or. 1982)
[128] *In re Midwest Processing Co.*, 41 B.R. 90, 102 (Bankr. D.N.D. 1984)
[129] *In re K.P. Enterprise*, 135 B.R. 174, 179 n.18 (Bankr. D. Me. 1992)
[130] *In re Fox Island Square P'ship*, 106 B.R. 962, 968 (Bankr. N.D. Ill. 1989); *In re McDonald Trucking Co., Inc.*, 76 B.R. 513, 516 (Bankr. W.D. Pa. 1987); *In re Turner*, 80 B.R. 618, 623 (Bankr. D. Mass. 1987)

objective prong focuses on whether the petitioner made a reasonable inquiry into the facts and law surrounding the case prior to filing the involuntary petition. The subjective prong focuses on whether the petition was filed to achieve an improper purpose.[131]

Each of these tests overlap,[132] and each is reflected in the factors enunciated in the Third Circuit's "totality of the circumstances" test. A court may consider any and all factors including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.[133] As the "totality of the circumstances" test implies, no one factor is dominant. Importantly, a petitioner is presumed to have filed its petition in good faith. As a result, an alleged debtor has the burden of showing a bad faith filing by a preponderance of the evidence.[134]

Luxeyard's main allegation is that Jinsun caused the Petition to be filed: (i) to avoid liability by gaining a tactical advantage in the Alattar Action and (ii) to force Luxeyard

---

[131] *In re K.P. Enterprise*, 135 B.R. 174, 179–80 (Bankr. D. Me. 1992); *Matter of Elsub Corp.*, 66 B.R. 189, 194 (Bankr. D.N.J. 1986)

[132] *In re Whiteside*, 240 B.R. 762, 766 (Bankr. W.D. Mo. 1999) (adopting the improper purpose test "with the understanding that it encompasses both" the improper use test and the improper purpose test).

[133] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015)

[134] *Id.* at 335

(through LY Retail) out of business.[135]  Luxeyard also makes several cursory allegations—some made for the first time at the Joinder Hearing—invoking all of the other *Forever Green* factors, and arguing that each militates against entering an order for relief.

Jinsun argues that its sole purpose in filing the Petition was to protect creditors.  It asserts that Mr. Mireskandari is "siphoning off" funds that could go to pay creditors, and that "the protections of the Bankruptcy Code are appropriate—indeed, necessary—to establish a centralized location to collect assets, to recover avoidable transfers, to avoid further dissipation of funds, and to ensure that all of Luxeyard's creditors are paid."[136]

*Analysis*

Much of Luxeyard's argument addressed its general theory that Mr. Casey, though his various entities and others who are a part of his "group," orchestrated the pump-and-dump scheme and the two previous bankruptcies, and that the filing of the Petition is just a continuation of those bad acts.[137]

Initially, the question of whether the alleged pump-and-dump scheme actually occurred, and the role, if any, of Mr. Casey and Jinsun in that alleged scheme is a central factual issue in the hotly contested Alattar Action.  That action has been pending for four years and involves numerous individuals and entities that are not parties to this contested matter.  From what has been presented to the Court, it is not hard to conclude that any trial on the Alattar Action will last weeks, if not longer.  It is evident, then, that the Court cannot find on the record developed at a half-day hearing that Mr. Casey and his "cohorts"

---

[135] Bar to Joinder Mot. ¶ 37
[136] Objection ¶ 32; *see also* Bar to Joinder Hr'g Tr. 150–55
[137] Bar to Joinder Hr'g Tr. 26–27

orchestrated or participated in any scheme.[138]  Nonetheless, Luxeyard asks the Court to

presume that the Alattar Action will succeed.  It further asks the Court to accept a certain

premise: that because Mr. Casey's group committed previous bad acts, all of Jinsun's

subsequent actions, including the filing of the Petition, are fraudulent or in bad faith.  But,

as Luxeyard has the burden of proof on this issue, the Court cannot indulge in Luxeyard's

presumption that Jinsun's actions in filing this bankruptcy case are an extension of a yet-

unproven scheme.[139]  While the Court cannot, and will not, draw any conclusions with

respect to the merits of the Alattar Action, its existence as well as the allegations made

therein, are appropriately considered on this motion.

Further, Luxeyard alleges that the petitioning creditors are not, in fact, creditors

because the 2012 Convertible Debentures they hold have met all the requirements for

mandatory conversion to equity and, as such, the Petition does not meet the statutory

requirements and is not meritorious.[140]  But, the Court can make no such finding.  As

already stated, the Court held a hearing on that issue in July, 2015, but Luxeyard was

unprepared to present the underlying facts (*i.e.*, all necessary documents) and to answer the

Court's questions on the law.  Since then, Luxeyard has chosen not to proceed with its

Motion to Dismiss, and instead prosecuted this Bar to Joinder Motion.  And, at the hearing,

---

[138] While Mr. Mireskandari testified, generally, regarding the background of the alleged pump-and-dump scheme, he and Luxeyard's attorneys expressly stated that they did not intend to present a detailed record on the matter.  Bar to Joinder Hr'g Tr. 21; 219–21.

[139] *See In re Metrogate*, 2016 WL 3150177, at *16 (Bankr. D. Del. May 26, 2016) ("[I]n weighing whether a filing is a bad faith litigation tactic such as form shopping, behavior in the underlying cause of action is not relevant.  The bankruptcy court must instead examine for what purpose its jurisdiction was invoked.").  The Court also observes that the very fact that three of the Original Petitioners settled with Alattar post-filing weighs against a determination that the Original Petitioners act as a group in this Court.

[140] *Alleged Debtor Luxeyard, Inc.'s Reply in Further Support of the Motion Seeking to Bar the Joinders of the Jonathan Camarillo Trust and Chris Clayton as Additional Petitioning Creditors In the Involuntary Petition Pursuant to 11 U.S.C. § 105* ¶¶ 17–19 [Dkt. No. 148] ("Reply")

Luxeyard specifically stated it was not addressing "whether or not the petitioner satisfied the statutory requirements for filing, and whether or not there's a meritorious case."[141]  The bifurcation of issues between the two motions precludes a finding here that Jinsun is not a creditor or had reason to believe that its claim was subject to a bona fide dispute.

Finally, Luxeyard presented no testimony regarding its current or historical assets or liabilities (other than the proceeds from the Alattar Action) or whether Luxeyard is paying its debts as they become due.  Luxeyard argues that the burden on the latter issue is on the petitioning creditors.[142]  While in the context of a motion to dismiss, the petitioning creditors would have the burden of proof on whether Luxeyard is paying its debts as they come due,[143] the alleged debtor has the burden to prove bad faith.  Where, as here, Luxeyard chose to move forward on its Bar to Joinder Motion based solely on Jinsun's bad faith, it was incumbent upon Luxeyard to bring its financial information forward.  It did not.

In this context, the Court will analyze the remaining *Forever Green* factors.

### ***Whether the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing the Petition***

Luxeyard argues that Jinsun did not perform "any due diligence that is required prior to initiating an involuntary bankruptcy case."[144]  To support this position, Mr. Mireskandari testified that no petitioner presented Luxeyard with a demand for payment.[145]  Luxeyard's argument appears to be that Mr. Casey performed inadequate due diligence because he did not reach out to Luxeyard and attempt to reach a consensual resolution to his claim.

---

[141] Bar to Joinder Hr'g Tr. 21
[142] Reply ¶ 26
[143] 11 U.S.C. § 303(h)(1); *In re A & J Quality Diamonds, Inc.*, 377 B.R. 460, 463 (Bankr. S.D.N.Y. 2007)
[144] Reply ¶ 36
[145] Bar to Joinder Hr'g Tr. 27–29, 33–34

When reviewing the due diligence factor the Court is not concerned with whether a petitioner exercised its negotiation options, but whether it "made a reasonable inquiry into the relevant facts and pertinent law before filing."[146] Before filing the Petition, Mr. Casey had discussions with Luxeyard's former CEO and reviewed (i) Luxeyard's most recent quarterly securities and exchange filings, (ii) Mr. Mireskandari's testimony in the First Luxeyard Bankruptcy, and (iii) an outside audit report relating to the status of Luxeyard's debentures.[147] Mr. Casey's review of these documents led him to conclude that the 2012 Convertible Debentures were due and owing, that Luxeyard was insolvent, and that it was improperly dissipating its assets.[148] Mr. Casey also consulted an attorney regarding available relief in a bankruptcy case.[149]

Additionally, on February 11, 2014, Jinsun's attorney sent Luxeyard a letter noting that the 2012 Convertible Debentures had matured and had not been paid, and requesting, albeit under a shareholder statute, updated financial information.[150] The letter was sent to Mr. Mireskandari, Luxeyard's registered agent, and Luxeyard's attorneys. In part, the letter states: "Jinsun, LLC has settled various lawsuits brought by Luxeyard; however, Luxeyard has not accounted for the proceeds of such settlements."[151] Based on this unrebutted testimony, the Court finds that, prior to filing the Petition, Mr. Casey made a "reasonable inquiry" into the facts and law.

---

[146] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015)
[147] Bar to Joinder Hr'g Tr. 135–47
[148] *Id.*
[149] *Id.* at 154, 177
[150] Bar to Joinder Hr'g Tr. 147–48; Ex. 38, *Hirsch & Westheimer Letter*
[151] Ex. 38, *Hirsch & Westheimer Letter*

***Whether there was evidence of preferential payments to certain creditors or dissipation of the
alleged debtor's assets***

In support of its claim that Luxeyard is improperly dissipating its assets, Mr. Casey

submitted unrebutted evidence that in 2012, funds from the 2012 Luxeyard Settlement paid

to Luxeyard were deposited in an LY Retail bank account,[152] that $200,000 from the

settlement proceeds was transferred to Mr. Mireskandari, and that Luxeyard did not pay

any other creditors at that time.[153] Mr. Casey also testified that based on the SEC filings he

reviewed Luxeyard was balance sheet insolvent at the time. This information is dated, but

was the best information available prior to the filing of the Petition, especially in light of

Luxeyard's non-response to Jinsun's letter seeking current information.

Luxeyard's current handling of its affairs is consistent with its past practices.

Presently, Luxeyard is receiving settlement funds, which Jinsun contends are similarly being

siphoned off by Mr. Mireskandari. While, of course, Mr. Mireskandari does not admit

absconding with Luxeyard's settlement funds, his testimony largely confirms Jinsun's

concerns.

As discussed above, Mr Mireskandari testified that settlement proceeds from the

Alattar Action are Luxeyard's largest asset. These proceeds are being split among

Mr. Alattar, Luxeyard, LY Retail, Mr. Mireskandari and Ram Mires (Mr. Mireskandari's

firm), Alidad Mireskandari (Mr. Mireskandari's brother), and Mr. Daghighi

(Mr. Mireskandari's brother-in-law brother) in an undocumented and random fashion. [154]

As between Luxeyard and Alattar, there is no way to know on this record if Luxeyard is

---

[152] Ex. O
[153] Bar to Joinder Hr'g Tr. 112–13
[154] *Id.* at 98–101

getting its "fair share" of the entire settlement proceeds—especially given that it is funding the litigation.  And, as among the non-Alattar entities, there is no way to know on this record whether the non-Alattar share is being split appropriately among Luxeyard, LY Retail, Ran Mires, Mr. Mireskandari, Alidad Mireskandari, and Mr. Daghighi.  Further, there was no testimony regarding current or historical assets or liabilities, whether Luxeyard is paying its debts as they become due, or whether Luxeyard currently maintains a bank account into which it deposits its share of settlement proceeds.

Even ignoring Mr. Casey's testimony, the record made by Luxeyard raises more questions than it answers about Luxeyard's largest asset—the settlement proceeds—and whether that asset is being dissipated to the detriment of Luxeyard's creditors.  The Court cannot rule out the possibility that Luxeyard's biggest asset is being dissipated.  Nor can the Court rule out that consistent with previous practice and the loose, undocumented division of settlement proceeds, Luxeyard may currently be making preferential transfers to insiders, or even fraudulent conveyances.

### *Whether the filing was motivated by ill will or a desire to harass*

Luxeyard argues that the ongoing Alattar Action creates a risk of liability for Mr. Casey and Jinsun and that, as a result of the litigation, Mr. Casey both seeks to obstruct those proceedings by filing the Petition and harbors ill will towards Luxeyard and its co-founders.[155]  Luxeyard further contends that Jinsun intended to use the Petition to exercise its ill will and put Luxeyard out of business.  Mr. Casey flatly denies this motivation.

---

[155] *Id.* at 60–65

The Court cannot find that Jinsun filed this case to put Luxeyard out of business. Luxeyard's operating company, LY Retail, had not conducted meaningful business for some time prior to the Petition.[156]  Mr. Mireskandari testified that he attempted to re-launch the company's operations in 2014, but was ultimately unsuccessful.[157]  Additionally, Mr. Casey testified credibly that he believed that LY Retail was non-operational before he filed the petition.[158]  This leaves Luxeyard to argue that Mr. Casey intended to put a non-operating company "out of business," a position the Court cannot credit.

Embracing a somewhat related line of reasoning, Luxeyard argues that Jinsun intended to derail new funding that was meant to revitalize LY Retail.  Mr. Mireskandari testified that in the summer of 2014 Luxeyard and an entity called Southwick Capital were working on a deal to provide Luxeyard with new funding that would have allowed Luxeyard to "re-launch" LY Retail.[159]  He also testified that Southwick Capital decided not to move forward with the deal after it learned of this involuntary petition.[160]  However, Luxeyard did not present any evidence that Mr. Casey knew about the pending deal with Southwick Capital or, more importantly, that he attempted to use the Petition to thwart the pending deal.  The Court will not find that Mr. Casey filed the Petition intending to affect an event of which he was unaware.[161]

The Court easily finds, however, that, the filing was motivated, at least in part, out of ill will or a desire to harass.  There are numerous objective reasons for Mr. Casey to harbor

---

[156] *Id.* at 36; 148–49; 196
[157] *Id.* at 42–43
[158] *Id.* at 186, 193
[159] *Id.* at 115–16
[160] *Id.* at 115–16
[161] *See Metrogate*, 2016 WL 3150177, at *9 (noting that one "would need to be trapped in a time warp" to mention in a pleading events that had not yet occurred)

animosity towards Mr. Mireskandari and Luxeyard.  Mr. Casey, through his Trust and its

various entities, is in the business of investing and investment consulting.  Since 2012,

Mr. Mireskandari and Luxeyard have been publically accusing Mr. Casey of securities

fraud.  Further, Mr. Mireskandari has provided information regarding Mr. Casey and

Jinsun to the Federal Bureau of Investigation and the Office of the United States

Attorney.[162]  And, Luxeyard continues to prosecute, through Mr. Alattar, litigation related

to the pump-and-dump scheme that Mr. Casey and Jinsun previously settled.  Under these

circumstances, as Mr. Mireskandari candidly admitted, there is ill will between the

parties.[163]  The Court does not credit Mr. Casey's testimony that none exists.  Given the

history between the parties, it is more likely than not that Mr. Casey filed the Petition, in

part, out of animosity and simply to annoy and harass Mr. Mireskandari; at the very least,

harassing Mr. Mireskandari was an added benefit.

### *Whether the filing of the Petition had suspicious timing*

Luxeyard alleges that the timing of the filing of the original petition was

suspicious.[164]  Luxeyard presented evidence showing that, two months before the petition

was filed, the LY Retail Bankruptcy was resolved and, separately, that the Alattar Action

was remanded to the Texas state court.[165]  Luxeyard suggests that the efforts to remove the

Alattar Action to federal court and the pending LY Retail Bankruptcy were meant to delay

---

[162] Bar to Joinder Hr'g Tr. 222–25.  Mr. Casey testified that he had received a letter from the
Department of Justice, but proclaims not to know whether he is a target of an investigation.  I
cannot credit this statement.

[163] Bar to Joinder Hr'g Tr. 65 ("And I'm sure the ill harbor goes both ways. . . .  [I]t wouldn't be
normal if it wasn't.")

[164] Luxeyard presented evidence that the timing of the joinders was suspicious.  Bar to Joinder Hr'g
Tr. 122–25.  That evidence is irrelevant to the Court's current analysis as is any alleged bad faith of
the Joining Petitioners.

[165] Ex. 19, *Settlement Agreement*; Ex. 36, Memorandum Opinion and Order, *Alattar v. Sano Holdings,
Inc. et al.*, 14-266 (S.D. Tex. July 7, 14)

the Alattar Action, or at least distract Mr. Mireskandari's attention, and that once those tactics ran their course the Petition was the next delay tactic. The petitioners offer an alternative explanation for the timing: that the Petition was filed nearly two years to the day after the 2012 Luxeyard Settlement, thus preserving the ability of a trustee to review the circumstances surrounding the settlement, including the transfer of proceeds to Mr. Mireskandari. Both of these explanations are plausible.

### *Whether the filing was used as a substitute for customary debt-collection procedures*

Luxeyard next contends that the Petition was "used as a substitute for a debt-collection device."[166] Luxeyard specifically alleges that the Petition was filed in "an attempt to forum shop and gain an advantage for Jinsun, Casey, Camarillo, and other defendants in the [Alattar Action]."[167] While this argument is not sufficiently fleshed out, it appears that Luxeyard believes the filing here was meant to take jurisdiction away from the Texas court in the Alattar Action. Nothing about the filing of the Petition, however, automatically determines the forum in which the Alattar Action will proceed, even as to Luxeyard's claims as a plaintiff in that case or to any counterclaims against Luxeyard.

Luxeyard further contends that "if the Petitioning Creditors were actually seeking payment for their claims, they should have brought a claim to do so in New York pursuant to their Debenture Purchase Agreements."[168] There is no question that a New York state court would be able to enter a judgment against Luxeyard, if appropriate, based on non-payment of the 2012 Convertible Debentures. But, here, Luxeyard did not adduce any evidence regarding its ability to satisfy any judgment obtained in state court. Mr.

---

[166] Reply at 11
[167] Reply ¶ 37
[168] Reply ¶ 38; Ex. 27, *Jonathan Camarillo Trust Debenture Purchase Agreement* § 5.9

Mireskandari's testimony raises significant questions about the settlement proceeds, how they are being divided, and what is happening with Luxeyard's share. Based on the record, the Court cannot determine that the petitioning creditors can recover without the tools available in bankruptcy, including accounting for Luxeyard's assets.

### *The remaining factors: obtaining a disproportionate advantage; gaining a tactical advantage*

Luxeyard's remaining arguments may fall within one or more of the remaining *Forever Green* factors.

### (i)      *Alleged interference with / advantage in the Alattar Action*

First, Luxeyard appears to argue that the Petition was filed so that Jinsun could obtain a disproportionate advantage over others by improving its position in the Alattar Action. Mr. Mireskandari testified that continuing the Alattar Action against Jinsun and Mr. Casey is expensive and that a bankruptcy trustee, if one is appointed, may find further litigation to be cost prohibitive. His testimony suggests that a trustee in bankruptcy would settle for less than Mr. Alattar and Mr. Mireskandari would settle for—thus benefitting Mr. Casey, and not Luxeyard's other creditors.

On a more general note, Luxeyard argues the more basic proposition that the filing of the Petition by Jinsun, a defendant in state court litigation, is merely an attempt to defeat a possible judgment against Jinsun and Mr. Casey, and thus, to gain a tactical advantage in the Alattar Action. Jinsun's simplistic counter-argument is that Luxeyard has no pending claims against Mr. Casey and Jinsun, all of which were settled in the 2012 Luxeyard Settlement. This, of course, ignores the reality that Mr. Allatar's claims against Mr. Casey and Jinsun are still pending and that Luxeyard shares in recoveries on these claims albeit in some indeterminate amount.

At first blush, Luxeyard's argument has some appeal, and harkens back to *Forever Green*. But, *Forever Green* is distinguishable. In *Forever Green* the single petitioning creditor, ProGreen, was a competitor of Forever Green (the alleged debtor). ProGreen's principle, Mr. Dawson, held a prepetition judgment against Forever Green which was not satisfied. In turn, Forever Green filed a lawsuit against ProGreen for diversion of corporate assets, which was proceeding in arbitration. Forever Green had ceased operations; its largest asset was the potential proceeds from its lawsuit against ProGreen. Mr. Dawson attempted to satisfy his judgment by whatever means possible, including interfering with the arbitration. He filed a motion to terminate the arbitration and issued a writ of execution to the arbitrator, which sought to garnish that portion of the arbitrator's fee paid by Forever Green. Determining he now had a conflict with Mr. Dawson, the arbitrator suspended the arbitration. When Forever Green began legal action seeking to reinstate the arbitration, ProGreen followed through with a previous threat and filed an involuntary bankruptcy petition. The bankruptcy court found: (i) that Mr. Dawson's intention was to use the involuntary to "frustrate" Forever Green's litigation of its claim against ProGreen and to collect on his consent order ahead of other creditors that held higher priority claims, and (ii) that, had Dawson done a reasonable investigation prior to filing the case, he would have learned that Forever Green was not dissipating its assets.

Like in *Forever Green*, Jinsun is a defendant in a lawsuit that represents Luxeyard's largest asset. But, Jinsun has taken no steps prepetition or postpetition to directly shut down the Alattar Action, which has continued (except, apparently, as temporarily stayed by the Texas court) throughout the almost two years this matter has been pending. And, Jinsun did a reasonable investigation which led it to reasonably believe that assets were being

dissipated.  Further, there is no evidence that Mr. Casey is attempting to coerce Luxeyard into paying Jinsun's debt outside of the bankruptcy distribution process or that Jinsun is seeking to have its claim paid ahead of others with higher priority.

Second, Luxeyard argues that Jinsun filed the Petition to gain a tactical advantage in both the Alattar Action and the First Luxeyard Bankruptcy by making three specific assertions.  Luxeyard introduced two filings from the Allatar Action: a Motion to Stay the Allatar Action filed by several defendants, including Mr. Casey, and a Suggestion of Bankruptcy filed by Mr. Casey. [169]  In the Motion to Stay Case, Mr. Casey and other defendants ask the Texas court to stay the Alattar Action pending the appointment of a trustee in the First Luxeyard Bankruptcy pending in California.  In the Suggestion of Bankruptcy, Mr. Casey asserts that the automatic stay of section 362 applies to him, as someone to whom Luxeyard owed indemnification obligations, and he requests, again, that the Alattar Action be stayed in its entirety.  These filings could show that Mr. Casey did not hesitate to use the First Luxeyard Bankruptcy to interfere with the Alattar Action, but, in and of themselves, these filings do not show that Mr. Casey used *this* bankruptcy case to interfere with the Alattar Action.[170]

Luxeyard also contends that after the filing of this involuntary bankruptcy case, certain, unidentified co-defendants in the Alattar Action "confused" the judge by discussing this case, and, as a result of the confusion, the Texas court stayed the entire Alattar Action. This case remained dormant until the Court granted certain co-defendants' motion to lift the stay.[171]  But, Luxeyard does not allege that Mr. Casey ever spoke with those who made the

---

[169] Ex. 25, *Motion to Stay Case*; Ex. 26, *Suggestion of Bankruptcy*

[170] It appears that at the time of the filings Luxeyard was still a defendant in the Alattar Action.

[171] Bar to Joinder Mot. ¶¶ 59–62; *Agreed Order on Motion for Relief from the Stay* [Dkt. No. 130]

filings or directed, advised, or otherwise asked them to attempt to obtain a stay. And, more importantly, it adduced no evidence to that affect. Luxeyard's vague assertions that Jinsun filed the Petition with the general hope that some other defendant would use the bankruptcy case as a justification to take some action that would derail or at least slow down, the Alattar Action is too attenuated from the factual record for the Court to agree with Luxeyard's conclusion.[172]

### (ii)    Alleged interference with / advantage in the First Luxeyard Bankruptcy

Luxeyard also argues that Jinsun used this case to obstruct the First Luxeyard Bankruptcy. As set forth above, Judge Russell dismissed the First Luxeyard Bankruptcy, but denied Luxeyard's motion for attorneys' fees, costs, and damages under section 303(i). Luxeyard filed a motion for reconsideration of that ruling. Jinsun filed an opposition in which Jinsun argued that Luxeyard no longer had standing to prosecute the reconsideration motion because the Court had entered (later vacated) an order for relief in the case and a chapter 7 trustee had been appointed.[173] Importantly for purposes of the Bar to Joinder Motion, however, Luxeyard's reconsideration motion was filed approximately one month *after* Jinsun filed the Petition. As the filing in the First Luxeyard Bankruptcy predates this

---

[172] Luxeyard's response to the stay of the Alattar Action does not support Luxeyard's assertion that it desires the Alattar Action to move forward as quickly as possible. After the Texas court stayed the Alattar Action, Luxeyard did not ask this Court for assistance in proceeding with the Alattar Action. Instead, Luxeyard states that its lead bankruptcy counsel "suggested those defendants [that had 'confused' the Texas court] move for stay relief." Bar to Joinder Mot. ¶ 62. After those defendants filed the motion for stay relief, they then filed a certification of counsel indicating that Luxeyard agreed to the stay relief. *Certification of Counsel regarding Agreed Order Granting Relief from Stay* [Dkt. No. 128]. That is, while Luxeyard did not oppose the stay relief, it undertook no direct effort to ensure that this case would not stall the Alattar Action. This indirect strategy is inconsistent with Luxeyard's declared goal of moving the Alattar Action forward with all due haste, but is consistent with the strategy it has taken throughout this bankruptcy case.

[173] Ex. 37 at 6, *Opposition to Debtor's Motion for Order Pursuant to Fed. R. Bankr. P. 9024, Relieving the Debtor of This Court's Order of October 21, 2013; Which Denied the Debtor's Motion for Award of Damages Against the Petitioning Creditors, Pursuant to 11 U.S.C. § 303(i)*

case, the Court cannot find that Jinsun filed the Petition with the intent to forestall an unfiled motion in the First Luxeyard Bankruptcy.[174]

### (iii)    Alleged involvement in prior involuntary bankruptcies

Luxeyard alleged that the Messrs. Casey and Gann, who is affiliated with Original Petitioners Sun Bear, LLC, and Lee Bear I, LLC, "orchestrated all three petitions."[175] Luxeyard, however, presented no evidence that Mr. Casey orchestrated the two previous bankruptcies.

## Conclusion: Luxeyard has not met its burden to show the Petition was filed in bad faith

"As courts of equity, bankruptcy courts are equipped with the doctrine of 'good faith' so that they can patrol the border between good-and bad-faith filings."[176]  At first blush, this case appears to test the limits of that boundary, but upon closer examination, it is clear that Luxeyard has not met its burden to show that the Petition was filed in bad faith.

As the Court observed at the outset, there is no evidence that the Petition did not meet the requirements in section 303.  Specifically, there is no evidence in the record that Jinsun does not have a claim based on the 2012 Convertible Debentures or that its claim is subject to bona fide dispute.  While Jinsun did settle Luxeyard's pump and dump allegations, the 2012 Luxeyard Settlement did not alter or affect "any of the rights, liabilities or obligations of [Luxeyard] to the Defendants, if any, pursuant to" the 2012 Convertible Debentures.  Thus, for purposes of this motion, the Court must assume that the statutory prerequisites are met and the Petition is meritorious.  Moreover, the lack of evidence that Luxeyard is paying its debts as they become due or that it is solvent suggests that filing the

---

[174] See Metrogate, 2016 WL 3150177, at *9 (noting that one "would need to be trapped in a time warp" to mention in a pleading events that had not yet occurred)

[175] Bar to Joinder Motion ¶ 37 incorporating MTD ¶¶ 49, 56, 64–75

[176] In re Forever Green, 804 F.3d at 334 (citing In re SGL Carbon, 200 F.3d 154 (3d Cir. 1999))

Petition to collect a debt was not an improper use of the bankruptcy system. From an objective and Rule 11, standpoint, Jinsun did its due diligence as to both the facts and the law prior to the filing of the Petition. Based on the best public evidence available it determined that Luxeyard was balance sheet insolvent and that it was unclear whether Luxeyard was properly managing its settlement funds. It attempted to obtain more current information from Luxeyard, but its attempts were rebuffed. From a subjective standpoint, the case boils down to two competing, but not mutually exclusive propositions: that the Petition was filed for the improper purposes of harassing Luxeyard and Mr. Mireskandari and to distract from the Alattar Action, and for the proper purpose of preventing further dissipation of Luxeyard's assets. Luxeyard's own testimony raises questions regarding the allocation of the settlement proceeds in the Alattar Action, whether Luxeyard is getting its fair share of those proceeds, and whether Luxeyard is preferring some of its creditors to others.

On this Bar to Joinder Motion, Luxeyard has the burden of proof to show bad faith. It has simply not met this burden. Based on the record, the only evidence that points in its favor is that Jinsun was partially motivated to file the Petition by its animosity towards Luxeyard. But, there is at least equal evidence that Jinsun filed the Petition for a proper purpose—to prevent dissipation of Luxeyard's self-described largest asset—and satisfies the other *Forever Green* factors. The Court cannot find, therefore, that Jinsun filed the Petition in bad faith.

**Conclusion**

Luxeyard presented a novel bar to joinder rule.  Luxeyard has failed, however, to carry its burden to prove bad faith by a preponderance of the evidence.  As a result, regardless of whether the Court finds that Luxeyard's rule is applicable—a decision the Court declines to make—it denies the Bar to Joinder Motion.  An order will follow.

Dated: September 12, 2016

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE